## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

ROBERT STEVE JOLLY, RANDALL L.     )
SAIN, CRYSTAL M. JOLLY, and        )
DEBORAH R. HOLLAR,                 )
                                   )
                Plaintiffs,        )
                                   )
        v.                         )       1:04CV01165
                                   )
ACADEMY COLLECTION SERVICE, INC.,  )
NICK GREEN, and                    )
CITIBANK (SOUTH DAKOTA) N.A.,      )
                                   )
                Defendants.        )

## ORDER AND RECOMMENDATION OF MAGISTRATE JUDGE ELIASON

This case is before the Court on three motions. Of central importance to the case are a motion for partial dismissal filed by defendants Academy Collection Service, Inc. (Academy) and Nick Green and a motion to dismiss filed by defendant Citibank. In addition to their dispositive motion, Academy and Green have also moved to strike or, in the alternative, have a chance to reply to plaintiffs' "resubmitted" answer to the partial motion to dismiss. Before dealing with the motions to dismiss, the Court will first quickly dispose of the motion to strike.

Academy and Green's motion to strike or file a reply requires only a short discussion. Plaintiffs' original response to Academy and Green's motion to dismiss was apparently written on behalf of all of the plaintiffs. However, plaintiffs are proceeding pro se and only one of them, Robert Steve Jolly, signed the response. Academy and Green pointed out in their reply brief that this was in violation of this Court's Local Rules because a pro se plaintiff

cannot simply sign for other persons. Plaintiffs then filed "PLAINTIFFS RESUBMITTS ANSWER FOR MOTION FOR PARTIAL DISMISSAL BY ACADEMY COLLECTION SERVICE, INC., AND NICK GREEN [sic]" with signatures for each plaintiff. The document was not merely a resubmission with added signatures, but also contained substantial additions to the earlier response. Naturally, Academy and Green objected to this document, which constitutes a second response filed both out of time and after the defendants had filed their reply brief.

Academy and Green now ask that the improper response be stricken or that they be allowed to reply to the additional arguments made in it. While plaintiffs' actions in rewriting the response are certainly not proper, the Court finds that neither of the solutions proposed by Academy and Green are necessary. Instead of striking the document or having more briefing on motions that are already extensively briefed, the Court will deny the motion to strike or reply, but will ignore the additional allegations and arguments made in the second response and decide the partial motion to dismiss based only on issues raised in the initial response.[1] The Court will now turn its attention to the motions to dismiss.

---

[1] While the outcome of the partial motion to dismiss would not be affected by the additional material inserted in the second response, this does not affect the Court's decision to ignore it. As will be seen, plaintiffs are guilty of abusive litigation practices not just because of this response, but the manner, tone and content of the responses. Such conduct should not be encouraged, in even the slightest.

## I. Facts and Claims

The essential facts, as alleged by plaintiffs in their complaint[2], are as follows. Plaintiffs are all current or former employees of a business not named or described in the complaint or elsewhere, but allegedly located in Lexington, North Carolina. Plaintiff Robert Steve Jolly is apparently the owner of the business and plaintiff Hollar was formerly employed there. (Complaint Ex. 1 (Letter from Robert Jolly to Academy, incorporated by reference into the complaint)) Plaintiffs Crystal Jolly and Randall Sain work at the business in unspecified capacities. Crystal Jolly is also Robert Jolly's daughter. (Pl. Resp. to Citibank's Mot. p. 4, Academy and Green's Mot. to Strike p. 2)

The complaint alleges that defendants Academy and Citibank are corporations and that defendant Green is employed by Academy as a debt collector. It claims that "[o]n numerous occasions, in connection with the collection of the alleged debt, defendants has [sic] communicated on four (4) separate occasions with non-consumer parties and at other times during October, November, and December, 2004 that will be discovered in discovery. . . ." (Complaint ¶ 17)

---

[2]So many background facts are absent from the complaint that it would be impossible to adequately describe the facts in the case based solely on the complaint. Therefore, on occasion, the Court may rely on statements made by the parties in other documents in order to set out background information. However, as far as the critical allegations used to actually support plaintiffs' claim are concerned, the Court will rely solely on the complaint.

Also, plaintiffs sometimes use the singular term "plaintiff" to refer to more than one plaintiff or the plural term "plaintiffs" to refer to only one or another of the plaintiffs. The same is true for their use of the terms "defendant" and "defendants." For the sake of convenience, the Court will simply regard all allegations as pertaining to all plaintiffs and defendants unless it is clear that this is not the case. This does not affect the outcome of the motions before the Court.

It then goes on to state that these communications were improper in many ways, including: occurring after defendants knew the employer did not want the calls being made, giving information about "consumer" to third parties without her consent, using profane or obscene language, causing the telephone to ring or engaging in conversations with intent to annoy and harass, falsely claiming to be an attorney, using false representations and deceptive means to collect the "alleged debt," identifying "plaintiff" as a person who does not pay debts, making defamatory statements, and improperly threatening to take legal action. The complaint also claims that defendants failed to properly verify the debt and failed to correctly identify themselves. Little or no additional detail is provided as to the accusations set out above.

Following the rendition of the facts in the complaint, it lists nine claims for relief. They are for: (1) a violation of "THE ACT," (2) libel, (3) libel per se, (4) slander, (5) slander per se, (6) fraud, (7) injurious falsehood, (8) intentional infliction of emotional distress, and (9) negligent infliction of emotional distress. Most of these claims simply say that plaintiffs repeat and reallege the previous paragraphs and that a particular statute has been violated or common law tort committed. Some make conclusory statements that plaintiffs have been damaged or suffer from emotional distress. The one exception is the fraud claim. It states that "[d]efendants represented themselves to plaintiffs as attorneys," that these representations were knowingly false, that plaintiffs relied on them while acting with ordinary

-4-

prudence, and that the false representations "severely injured all plaintiffs." (Id. ¶¶ 42-48) Again, these statements are not explained in further detail.

Having reviewed the complaint, defendants filed motions to dismiss. Academy and Green ask only that any state claims raised against them be dismissed for failure to state a claim on which relief can be granted. Citibank seeks complete dismissal of the case against it.

## II. Motion to Dismiss Standards

Defendants' motions are made pursuant to Fed. R. Civ. P. 12(b)(6). This type of motion to dismiss cannot succeed "'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Republican Party of North Carolina v. Martin, 980 F.2d 943, 952 (4th Cir.), cert. denied, 510 U.S. 828, 114 S.Ct. 93, 126 L.Ed.2d 60 (1993)(quoting Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Further, the Court must assume that the allegations in the complaint are true and construe them in the light most favorable to plaintiff. Id. The complaint does not need to forecast evidence sufficient to prove a claim. However, it must "allege facts sufficient to state elements" of a claim. Chao v. Rivendell Woods, Inc., 415 F.3d 342, 349 (4th Cir. 2005)(emphasis deleted).

Where plaintiffs' claims arise under state law, special rules apply. If state law is unclear, the Court must rule in such a manner as it appears the highest state court would rule if

-5-

presented with the issue. Where the state's highest court has not decided the particular issue, the Court will examine the rulings of the lower state courts. Rulings of these courts may be considered as persuasive evidence of state law, but are not binding should the Court be convinced the highest court would rule to the contrary. <u>Sanderson v. Rice</u>, 777 F.2d 902, 903 (4th Cir. 1985), <u>cert</u>. <u>denied</u>, 475 U.S. 1027, 106 S.Ct. 1226, 89 L.Ed.2d 336 (1986). Furthermore, the federal court must rule on state law as it exists, as opposed to surmising or suggesting an expansion of state law. <u>Burris Chemical, Inc. v. USX Corp.</u>, 10 F.3d 243 (4th Cir. 1993).

### III. Discussion

### A. Federal Claims Against Citibank

The first claim raised in plaintiffs' complaint is for relief under "The Act." It states that "defendants" violated "the Act." Although certainly not clear from the language of the claim itself, it is apparent from other portions of the complaint that "the Act" refers to one or both of two federal legislative acts. The jurisdictional section of the complaint states that jurisdiction is present under "The Fair Credit Reporting Act (FCRA or "Act 1")" and "The Fair Debt Collection Practices Act (FDCPA or "Act 2")" and that these laws will be collectively referred to as the "Act<u>s</u>." (Complaint ¶ 1)(emphasis added) Thereafter, the complaint sometimes refers to the statutes using this nomenclature, but also occasionally uses the term "the Act" without specifying which of the two laws is involved.

-6-

Plaintiffs' first claim for relief is one of the instances where the term "the Act" is used. For this reason, it is not clear from the face of the complaint whether plaintiffs intended to assert claims against all defendants under both acts, all defendants under one act, or some defendants under one act and some under both or the other. Defendants Academy and Green have not moved to dismiss the federal claim or claims raised against them. However, Citibank does seek dismissal and has briefed possible claims under both statutes. In response, plaintiffs state that they did not intend to raise claims against Citibank under the FDCPA, only the FCRA. (Pl. Resp. to Citibank's Mot. p. 5) Therefore, the Court will only discuss whether plaintiffs have stated a claim against Citibank under the FCRA.

As Citibank notes, there are only four specific references to the FCRA in the complaint--the previously mentioned jurisdictional reference in Paragraph 1, a purported definition of "person" in Paragraph 12, and two more substantive references in Paragraph 25. The first two references are obviously not allegations on which a claim can be based, so only the latter two need to be examined. Read in conjunction with Paragraph 24, the references in Paragraph 25 of the complaint claim that Citibank violated the FCRA because defendants divulged private information pertaining to "plaintiff" to "persons more fully herein" causing plaintiffs damages. Plaintiffs claim this information was revealed in a willful, reckless, negligent, or illegal fashion and in violation of Section 605 of the FCRA's requirement that reasonable procedures be used to

-7-

avoid improper disclosures. They also allege that defendants failed to use reasonable care and follow reasonable procedures to assure the accuracy of "information on plaintiff" in violation of Section 607(b) of the FCRA.

Plaintiffs' allegations suffer from several problems on their face. For instance, they appear to apply only to one unidentified plaintiff, not all of the plaintiffs, and they in no way explain what information was divulged or to whom. Without at least these basic facts, the allegations have no real meaning. Even setting aside these glaring defects, plaintiffs still have not stated a proper claim for relief. This is because the sections referenced in Paragraph 25 of the complaint do not apply to Citibank.

Section 605 of the FCRA is codified as 15 U.S.C. § 1681c. Section 607(b) is codified as 15 U.S.C. § 1681e(b). A simple reading of these statutes reveals that, by their unambiguous terms, they apply to "consumer reporting agencies." Rice v. Montgomery Ward & Co., 450 F. Supp. 668, 670 (M.D.N.C. 1978)(15 U.S.C. §§ 1681c and 1681e not among sections of the FCRA applying to non-reporting agencies). That term is defined for purposes of the FCRA by 15 U.S.C. § 1681a(f) which states, in pertinent part, that consumer reporting agencies are persons which, "for monetary fees, dues, or on a cooperative basis" regularly assemble or evaluate consumer credit information or other consumer information "for the purpose of furnishing consumer reports to third parties." A "consumer report" is a report by a consumer reporting agency intended to give information on a consumer's "credit worthiness,

credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living" for the purpose of being used as a factor in determining the consumer's eligibility for credit, insurance, employment, or several other uses not relevant to this action. 15 U.S.C. § 1681a(d).

Nothing in the complaint or any other pleading shows that Citibank is an entity acting as a consumer reporting agency under FCRA. In fact, it is identified in the complaint only as "a corporation having its principal place of business at 701 East 60th Street North, Sioux Falls, SD 57117, and [having] transacted business in the Middle District of North Carolina and at other locations throughout the United States." (Complaint ¶ 9) There is no allegation Citibank is a consumer reporting agency and there is no allegation that it could be one because it regularly assembles or evaluates consumer information in order to give consumer reports to third persons. Not only this, but plaintiffs' response to Citibank's motion to dismiss actually states that Citibank claims to be the creditor for a debt allegedly owed to it by plaintiff Hollar. (Pl. Resp. p. 2, and Ex. 1) In other words, plaintiffs affirmatively assert that Citibank played a role very different from that of a consumer reporting agency in this transaction. Companies that report information based on their own experience with customers are not credit reporting agencies. DiGianni v. Stern's, 26 F.3d 346, 348-349 (2nd Cir 1994)(collecting cases). In the end, nothing in the complaint alleges that Citibank is or was a consumer reporting agency and later allegations make it out to be

something else.[3]  Plaintiffs have not stated a claim for relief
under the statutes specifically listed in the complaint.

Perhaps realizing the problems with the FCRA claims as stated
in the complaint, plaintiffs use their response to argue that
Citibank violated additional provisions of the FCRA.  Specifically,
they contend that Citibank violated 15 U.S.C. § 1681i by failing to
follow proper procedures where a debt is disputed, and violated 15
U.S.C. § 1681s-2 by failing to remove the contested debt from
listings with "credit agencies" after failing to properly verify
the debt as required by 15 U.S.C. 1692g(b).  These arguments fail
for two reasons.

The initial problem is that these statutory sections were not
mentioned in the complaint and, given the rambling and conclusory
nature of the complaint, it would be more than generous to say that
the complaint fairly raised the issues in a recognizable fashion.
While there are mentions of failing to verify a debt and failing to
follow laws aimed at the accuracy of information, the statements in
the complaint are not nearly as cogent as those in plaintiffs'
response brief.  (See Complaint ¶¶ 25, 26)  Because of this,
plaintiffs' response brief is really akin to an improper attempt to
amend the complaint via a response brief.

Even if plaintiffs' basic pleading problems are ignored, they
still have not stated a claim under the statutes they cite in their
response.  Like the statutes that were mentioned in the complaint,

---

[3]As will be discussed later, it appears to be a "furnisher" of information
under the FCRA.

15 U.S.C. § 1681i is, by its unambiguous language, aimed at consumer reporting agencies. Creditors for an alleged debt are not mentioned as being subject to its requirements. As stated before, there is no allegation that Citibank is a consumer reporting agency within the meaning of the FCRA. Therefore, plaintiffs have not stated a claim under this section.

The final statute cited by plaintiffs, 15 U.S.C. § 1681s-2, is slightly different because it does apply to "furnishers" of consumer information, not consumer reporting agencies. Citibank does not argue that it is not a furnisher of information within the meaning of the statute. However, it does point out that plaintiffs have not sufficiently alleged that it has violated any of the several requirements placed on such furnishers. Section 1681s-2(a)(1)(A) prohibits the furnishing of information to a consumer reporting agency if the furnisher "knows or has reasonable cause to believe that the information is inaccurate." "Reasonable cause" is defined as "[h]aving specific knowledge, other than solely allegations by the consumer, that would cause a reasonable person to have substantial doubts about the accuracy of the information." 15 U.S.C. § 1681s-2(a)(1)(D). Section 1681s-2(a)(1)(B) prohibits the furnishing of information where the furnisher (1) has been notified by a consumer, at the address specified for such purposes, that information is inaccurate and (2) the information actually is inaccurate. Section 1681s-2(a)(2) states that persons who regularly furnish information to consumer reporting agencies as a part of their ordinary business must promptly correct any

-11-

information that they determine is not complete or accurate. Finally, § 1681s-2(a)(3) requires that furnishers of information inform consumer reporting agencies when a consumer disputes the information furnished.

Even considering the statements in plaintiffs' response brief, it is not clear which or how many of these statutory duties they even claim that Citibank has violated. All that can be said is that their argument is as follows: Citibank claimed that plaintiff Hollar owed it a consumer debt; Hollar requested validation of the debt from defendant Academy; Academy was required by 15 U.S.C. § 1692g(b) to send a validation from Citibank to Hollar within thirty days or the alleged debt was null and void; during the thirty-day period, debts listed with credit reporting agencies had to be marked as disputed during the thirty-day period, 15 U.S.C. § 1681i required the debt to be removed after 30 days if not validated; the debt was not validated as requested; despite not validating the debt, Citibank failed to correct information listed with credit agencies, did not remove the listing of the debt, and knowingly gave false information regarding the debt.

There are any number of problems with this argument. First, it is not fairly based on information in the complaint, but instead seeks to essentially amend the complaint to add certain facts.[4]

---

[4]It appears from plaintiffs' own submissions that the argument could not have been in the complaint at the time it was filed because the factual basis for it did not exist at that time. Exhibit 1 attached to their response brief contains a copy of the validation request allegedly sent to Academy. It is dated November 19, 2004. Plaintiffs have also included as Exhibit 2 a certified mail receipt that they claim shows delivery of the validation request to Academy. It
(continued...)

Next, it alleges that Hollar requested validation from Academy and that Academy had a duty to validate it, but then seeks to hold Citibank liable for the lack of validation and any consequences that stem from it. Plaintiffs offer no rationale for holding one defendant liable for the actions or inactions of another. Likewise, plaintiffs claim that the duty to validate arises under 15 U.S.C. § 1692g(b), a part of the FDCPA. However, they then claim violations based on the failure to validate under 15 U.S.C. §§ 1681i and 1681s-2, provisions of the FCRA. They provide no support for the idea that these two separate statutes work together in such a way.

There is also more. Plaintiffs make much of their contention that failure to validate a debt within thirty days of a request for validation renders it null and void. However, this is not supported by the statutes on which they rely. Instead, 15 U.S.C. § 1692g(b) applies to debt collectors (not creditors or furnishers of information), does not impose a thirty-day time period for them to verify a debt, and instead states only that debt collectors must stop attempting to collect the debt until they obtain either a verification of the debt, a copy of a judgment, or the name and address of the original creditor. The information gathered must

_____

[4](...continued)
is stamped with the date of November 24, 2004. Assuming that these exhibits and the law regarding validation are what plaintiffs claim them to be, Academy had thirty days from either November 19, 2004 or, more likely, November 24, 2004 to respond with a validation. The complaint was signed by plaintiffs on December 10, 2004 and filed on December 13, 2004, well before any thirty-day period would have expired. Plaintiffs current argument is obviously an improper attempt to amend the complaint through a brief to add an allegation based on facts occurring after the complaint was filed.

then be mailed to the consumer.  It does not state that the debt becomes null and void and it is difficult to see, in the absence of such language, how a mere failure to validate under 15 U.S.C. 1692g(b) would lead to any duties to cease listing the debt or update the information concerning the debt under the provisions of the FCRA.[5]  Debt collection attempts must cease until the debt is validated, but plaintiffs do not appear to claim that Citibank, as opposed to Academy and Green, engaged in any attempts to collect the debt.

In the end, all of plaintiffs' attempts at raising claims against Citibank under the FCRA are based on misstatements, misunderstandings, and/or misapplications of the law.  They also involve a great many alleged facts and claims not contained in their complaint.  For all of these reasons, they have failed to state a claim against Citibank under that statute and their claim under the FCRA should be dismissed.

### B. State Law Claims Against All Defendants

#### 1.  Libel and Slander

The second, third, fourth, and fifth claims for relief in plaintiffs' complaint are for libel, libel per se, slander, and slander per se, respectively.  Generally, libel and slander are two forms of defamation, with the difference between them being that slander involves spoken words and libel is written words.  Phillips v. Winston-Salem/Forsyth County Bd. of Educ., 117 N.C. App. 274,

---

[5]The Court notes that Exhibit 3 attached to plaintiffs' response indicates that, at least by February 4, 2005, a credit report belonging to plaintiff Hollar shows that a debt with Citibank is classified as being disputed.

277, 450 S.E.2d 753, 756 (1994). A statement is defamatory if it tends "to prejudice another in his reputation, office, trade, business, or means of livelihood." Donovan v. Fiumara, 114 N.C. App. 524, 526, 442 S.E.2d 572, 574 (1994)(quoting, Morrow v. Kings Department Stores, 57 N.C. App. 13, 20, 290 S.E.2d 732, 736, disc. review denied, 306 N.C. 385, 294 S.E.2d 210 (1982)). The statement must also be false. Id. at 528, 442 S.E.2d at 574.

Slander and libel are also divided into two general categories of defamation per se and defamation per quod.[6] A defamatory statement that charges a plaintiff with a crime involving moral turpitude, impeaches his or her trade or business, or accuses him or her of having a "loathsome disease" is actionable per se and the plaintiff does not have to allege or prove malice or special damages. They are presumed. Id. at 527-528, 442 S.E.2d at 574-575. For other defamatory statements, malice and special damages must be alleged and proven. Id. In pleading a cause of action for defamation, a plaintiff must recount the allegedly defamatory statement either verbatim or at least with enough specificity to allow the Court to decide if the statement is defamatory. Morrow, 57 N.C. App at 21, 290 S.E.2d at 737.

Plaintiffs have certainly not pled the elements of libel or slander per se. There is no allegation that could even remotely be construed as claiming that any of the defendants accused any of the plaintiffs of committing a crime of moral turpitude or having a

_____

[6]At least for libel, there is a third class of statements--those are statements capable of being read in two ways, with one being defamatory and the other not. However, this category is not relevant to the case at bar.

-15-

loathsome disease. As for impeaching plaintiffs in their trade or
business, plaintiffs generally claim that their trade or business
was disrupted by defendants' actions. However, they have not set
out facts alleging that defendants made false statements actually
impeaching them in their business or trade. In fact, they have not
even revealed the nature of their business or trade, much less
alleged that defendants stated that they were unfit to perform it
or performed it poorly. Finally, as will be discussed next,
plaintiffs have not pled the allegedly defamatory statements with
sufficient specificity. For all of these reasons, plaintiffs' have
not stated claims for libel or slander per se under North Carolina
law and the claims should be dismissed.

The Court also concludes that plaintiffs have not pled proper
claims for libel and slander per quod. The primary problem for
plaintiffs is that they have not directly set out any false and
defamatory statements which defendants are alleged to have made.
The actual statement of claims in their complaint is completely
conclusory. It does not give either the wording of any defamatory
statements or even describe their nature. Nor can any such
statements be gleaned from the factual portions of the complaint
with enough specificity to allow the Court to determine whether or
not they could be defamatory.

It is true that some paragraphs in the complaint do reference
false or deceptive representations. However, the accusations are
vague and/or do not involve defamatory comments. Paragraph 20 of
the complaint states that "defendants used false representations or

-16-

implication [sic] that the individual was an attorney," paragraph 22 says that "defendants used false representations or deceptive means to collect or attempt to collect an alleged debt or obtain information," paragraph 25 says defendants were involved in "communicating certain false information about plaintiffs," and "making untrue statements defaming, maligning and/or in other ways misrepresenting plaintiffs and/or communicating such incorrect and defamatory statements to third parties," and paragraph 26 claims that defendants acted in concert and "used or attempted to use false, misleading, abusive, unfair and/or deceptive means, presentations and/or procedures, including . . . identif[ying] plaintiff as a person who doesn't pay debts."

None of these allegations of false statements are sufficient to state a claim for liable or slander. The claim that defendants falsely represented themselves to be attorneys, even if accurate, did not defame plaintiffs or call their reputation into question, the allegations of false, defamatory, or maligning statements in paragraphs 22 and 25 are entirely conclusory and do not detail the statements in any fashion. Finally, plaintiffs' general statement that defendants identified "plaintiff" as a person who does not pay debts is also insufficient to state a claim. The accusation is in the middle of a lengthy list of alleged bad acts, which is in turn connected to the above stated series of adjectives including "false" and "defaming," but also including "abusive" and "unfair." Because of this, it is not clear whether plaintiffs are alleging that defendants falsely made this statement or whether this

-17-

statement is merely unfair and abusive. More importantly, the complaint also lacks necessary details regarding the exact statements made by defendants and their context. It gives nothing more than a general description of the idea plaintiffs believe was conveyed by defendants' statements. In violation of North Carolina's requirements for pleading defamation claims, plaintiffs have not provided the alleged statements with enough specificity to allow the Court to decide whether they are defamatory.

The deficiency in plaintiffs' claims is further illustrated by their response briefs. In their response brief to Citibank's motion, plaintiffs do not really refer to the statements from the complaint listed above in the complaint, but instead state that failure to remove the debt from credit reports after it was not validated within 30 days "constitutes willful defamation" and that Citibank's "continued willful listings of an alleged debt in credit reporting agencies proves defamation." (Pl. Resp. to Citibank's Mot. pp. 3, 4) As with their federal claims, plaintiffs oppose Citibank's motion by adding allegations to create a moving target. They also rely on the same unsupported and apparently inaccurate interpretations of federal law. This cannot save their claim.

Plaintiffs' response to Green and Academy's motion is similar. They again state that failure to remove the contested and unvalidated debt from credit reports constitutes defamation. (Pl. Resp. to Academy and Green's Mot. to Dis. p. 3) Plaintiffs do also refer to and clarify the statement in the complaint that defendants made it seem as if plaintiff Hollar was a person who did not pay

-18-

her debts.  However, their explanation does not help their case because it becomes clear from their brief that defendants did not actually make a statement to this effect, but that plaintiffs (and likely only Robert Jolly) simply inferred this from the previously mentioned credit reports and/or statements allegedly made by defendant Green.[7]  The brief states that by making repeated telephone calls and putting "collection purpose" into a credit report, Academy "labeled Mrs. Hollar as a person that does not pay her [d]ebts, and could not be trusted" and that defendants' publishing of "unverified information" in a credit report also caused this.  (Id. at p. 4)  It claims that Robert Jolly, in a letter attached to the complaint as Exhibit 1, stated that Mr. Green's repeated phone calls and false statements to him "caused information to be Diverged to him that disclosed Mrs. Hollar was a person that could not be trusted. [sic]"  (Id.)  Again, some of these arguments rely on facts not in the complaint and all are nothing more than plaintiffs or Jolly's inferences based on whatever statements defendants actually made.  Their failure to include these statements prevents the Court from determining whether the statements were ones that could give the impression that plaintiffs claim they did.[8]  Under North Carolina law, this

---

[7]To the extent Robert Jolly made the statements based on his inferences, he could potentially be liable for slander, but not defendants.

[8]It is also worth noting that plaintiffs' assertion concerning statements in Mr. Jolly's letter is not accurate.  While filled with hyperbolic language, threats of various legal actions, and a list of alleged misdeeds by defendants, the letter never mentions that defendants made statements that Hollar was a person who did not pay debts, never mentions statements to credit reporting
(continued...)

-19-

failure makes dismissal appropriate.  <u>See</u> <u>Morrow</u>, 57 N.C. App. at
21, 290 S.E.2d at 737 (dismissing slander claim where the complaint
"'leaves to conjecture that which must be stated'" quoting <u>Leasing</u>
<u>Corp. v. Miller</u>, 45 N.C. App 400, 405-406, 263 S.E.2d 313, 317,
<u>disc</u>. <u>rev</u>. <u>denied</u>, 300 N.C. 374, 267 S.E.2d 685 (1980)).

There is an additional reason for dismissing plaintiffs'
claims for libel and slander <u>per quod</u>.  North Carolina law requires
that special damages be pled in order to state these claims.
<u>Donovan</u>, 114 N.C. App. at 527-528, 442 S.E.2d at 574-575.  Also,
the damages must be of a pecuniary nature, not from humiliation.
<u>Williams v. Rutherford Freight Lines, Inc.</u>, 10 N.C. App. 384, 387,
179 S.E.2d 319, 322 (1971).  Both federal and North Carolina
pleading rules require that items of special damages be
individually set out.  Fed. R. Civ. P. 9(g)("When items of special
damage are claimed, they shall be specifically stated.");  N.C. Gen.
Stat. § 1A-1, Rule 9(g)("When items of special damage are claimed
each shall be averred.").

Plaintiffs have not met the pleading requirements for special
damages.  They do mention special damages in the complaint,
However, it is only in the statement that defendants' acts caused

---

[8](...continued)
agencies, and does not say that Robert Jolly or anyone else believed Hollar was
a person that did not pay her debts.  Again, Robert Jolly's letter, under his
construction of it, would expose him to a libel action by Hollar, but would not
in any way implicate defendants.  But, in fact, as for why Hollar was fired, the
letter states that "[b]ecause of your deliberate/willful actions and disruption
of my business the person you tried to contact has been terminated."  (Complaint
Ex. 1 p. 2)  It in no way attributes the firing to nonpayment of debts or a lack
of trust.  Plaintiffs' contention to the contrary is false and, unfortunately,
all too indicative of the abusive manner in which they have conducted this
lawsuit.

"plaintiffs special, general and punitive damages." (Complaint ¶ 23)  These damages are not listed, enumerated, nor explained in any way, much less as to each plaintiff.  The complaint does not even contain allegations that could be considered to be pecuniary damages arising from any alleged libel or slander.  The only arguable exception is the reference in Exhibit 1 of the complaint to plaintiff Hollar being fired from her job by plaintiff Robert Jolly.  In their response briefs, plaintiffs contend that this is an example of pecuniary damage suffered by Hollar.  However, as explained earlier, Exhibit 1 does not allege that slander or libel led to her firing, but instead attributes it to the disruption of Mr. Jolly's business by other bad acts allegedly committed by defendants.  <u>See</u> n.7 <u>supra</u>.  This does not state a claim for relief.  <u>Tallent v. Blake</u>, 57 N.C. App. 249, 255, 291 S.E.2d 336, 340 (1982)(no damages present where loss of job stemmed from events other than slander).  Plaintiffs have not adequately pled special damages.  Because of this and all of the other reasons previously set out, all of plaintiffs' claims for libel and slander should be dismissed.

### 2.  Fraud

Plaintiffs' next claim for relief is for fraud.  To allege a claim for fraud in North Carolina, a party must plead five "essential elements: (1) a false representation or concealment of a material fact, (2) that was reasonably calculated to deceive, (3) which was made with the intent to deceive, (4) that did in fact deceive, and (5) resulted in damage."  <u>Breeden v. Richmond</u>

-21-

Community College, 171 F.R.D. 189, 194 (M.D.N.C. 1997)(citations omitted). Like the special damages portion of libel and slander per quod, fraud allegations are subject to a heightened pleading standard in both federal and North Carolina pleading practice. Fed. R. Civ. P. 9(b)("[In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.); N.C. Gen. Stat. 1A-1, Rule 9(b)("averments of fraud . . . shall be stated with particularity"). This generally means that a plaintiff must plead the "time, place, and contents of the false representations, as well as the identity of the person making the representation and what he obtained thereby." Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1297, at 590 (1990); see also Breeden; Terry v. Terry, 302 N.C. 77, 85, 273 S.E.2d 674, 678 (1981).

While plaintiffs' assertions connected to their fraud claim are somewhat more detailed than their other claims, they still have not managed to meet the pleading requirements for a fraud claim. Unlike the other claims in the complaint, the fraud claim does not merely incorporate the factual allegations made early in the complaint and then summarily state that a cause of action has accrued and that damages have occurred. Instead, the fraud claim asserts that "[d]efendants represented themselves to plaintiffs as attorneys," that these "representations were false," that defendants knew them to be false, that "[p]laintiffs relied on these representations," that they acted with ordinary prudence in doing so, and that "[s]uch false representations severely injured

plaintiffs." (Complaint ¶¶ 43-48) In the letter attached as Exhibit 1, Robert Jolly explains this allegation further by saying that defendant Green "implied he had legal papers/matters to discuss leading my employees and I to believe he was a lawyer." (<u>Id</u>. Ex. 1 p. 1) Other portions of the complaint mention "false" or "falsity." However, they are used only in general pronouncements and cannot be connected to particular alleged statements by defendants. (Complaint ¶¶ 21, 25, 26, 28)

Even read with the entire complaint in mind and with all doubts resolved in favor of plaintiffs, they have not pled a claim for fraud. Overall, the complaint could be read to allege that, at some unspecified time or times during October, November, or December of 2004, Mr. Green called Robert Jolly's business, spoke to some or all of the plaintiffs, and stated that he needed to discuss legal papers or matters. Plaintiffs' further contention would be that he did this to make them believe that he was an attorney and that his clever ruse was successful in this regard. Of course, the complaint does not give the exact times or dates of these conversations and does not tell the words Green supposedly used or the context in which he used them. All of this would be necessary for the fraud claim to be properly pled. Even more importantly, the goal of Green's alleged plan of deception is completely absent from the complaint, as is any allegation of his success in achieving it. Even if it could be inferred that Green hoped plaintiffs would believe he was an attorney and that this would somehow lead to repayment of the debt owed by Hollar, there

is no allegation he succeeded, and the overall pleadings in the case would suggest that he was spectacularly unsuccessful in this regard. Plaintiff Hollar contests the very validity of the debt and there is no sign that she paid any of the money sought by defendants because she believed Green was an attorney or for any other reason. Consequently, plaintiffs have not, and indeed cannot, state a claim for fraud under the theory advanced in the complaint.

Plaintiffs attempt to use their brief to significantly expand their allegations of fraud by both associating facts already in the complaint with the fraud claim through further explanation and by adding facts in their brief. They state in their response to Citibank's motion that Citibank is continuing to commit fraud by listing a false debt with credit reporting agencies. (Pl. Resp. to Citibank's Mot. p. 4) Of course, this is not in the complaint and again does not tell what, if anything, Citibank has procured through its alleged fraudulent acts.

Plaintiffs repeat this claim, or something similar, as to Academy and Green. They also rely on the "implied attorney" theory contained in the complaint and add an argument that the debt defendants sought to collect from Ms. Hollar is itself a fraud. (Pl. Resp. to Academy and Green's Mot. to Dis. pp. 5-6) The first two arguments fail for the reasons already set out. As for the claim that the debt is fraudulent, they again provide none of the necessary details and make no claim that defendants have obtained anything as a result of their misrepresentations concerning the

-24-

existence or amount of the debt.  Defendants' motions should be
granted as to plaintiffs' fraud claim.

### 3.  Injurious Falsehoods

Plaintiffs' seventh claim for relief purports to be one "**FOR
RELIEF IN INJURIOUS FALSEHOOD**"(emphasis in original).  It first
incorporates previous allegations and then reads "plaintiffs has
[sic] been damaged as a result of defendants communicating
injurious falsehoods."  (Complaint ¶¶ 49-50)  Defendants assert,
and the Court concurs, that there appears to be no such cause of
action in North Carolina.  The term "injurious falsehoods" is used
infrequently in certain slander and libel cases to describe those
causes of action.  See  Matthews v. Johnson Pub. Co., Inc., 89 N.C.
App. 522, 366 S.E.2d 525 (1988)(libel); Park v. Sleepy Creek
Turkeys, Inc., 60 N.C. App. 545, 299 S.E.2d 670 (1983)(slander);
Whyburn v. Norwood, 47 N.C. App. 310, 267 S.E.2d 374 (1980)(slander
of title).  It appears that plaintiffs may have confused this or
similar language for a separate cause of action.  Defendants also
correctly note that, if a separate claim with this name did exist,
it would be treated the same as and dismissed for the same reasons
as plaintiffs' defamation claims.  Plaintiffs have not contested
defendants' arguments other than on the grounds already discussed
above in dealing with the defamation claims.  Their claim for
"injurious falsehoods" should be dismissed.

## 4. Intentional Infliction of Emotional Distress

The next claim in plaintiffs' complaint is for intentional and negligent infliction of emotional distress. In order to prevail on a claim for intentional infliction of emotional distress, plaintiffs must show that (1) defendants engaged in extreme and outrageous conduct, (2) intending to cause and actually causing, (3) severe emotional distress. <u>Patterson v. McLean Credit Union</u>, 805 F.2d 1143, 1146 (4th Cir. 1986), <u>aff'd in part and vacated in part</u>, 491 U.S. 164, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). Defendants contend that plaintiffs have failed to successfully plead the first and third elements of their intentional infliction claim.

The standard for what constitutes extreme and outrageous behavior in North Carolina is "a stringent one." <u>Id</u>. In order to support their claim, plaintiffs must show that defendants' actions were so extreme and outrageous that they exceeded all bounds usually tolerated by decent society. <u>Dickens v. Puryear</u>, 302 N.C. 437, 447, 276 S.E.2d 325, 331 (1981). "'[L]iability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.'" <u>Johnson v. Bollinger</u>, 86 N.C. App. 1, 6, 356 S.E.2d 378, 382 (1986)(quoting <u>Briggs v. Rosenthal</u>, 73 N.C. App. 672, 677, 327 S.E.2d 308, 311, <u>cert</u>. <u>denied</u>, 314 N.C. 114, 332 S.E.2d 479 (1985)). Whether the conduct is extreme and outrageous is a question of law for the Court. <u>Brown v. Burlington Indus., Inc.</u>, 93 N.C. App. 431, 436, 378 S.E.2d

232, 235 (1989), review dismissed, 326 N.C. 356, 388 S.E.2d 769 (1990).

As for the element of severe emotional distress, the North Carolina Supreme Court has defined that phrase to mean "any emotional or mental disorder, such as, for example, neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." Waddle v. Sparks, 331 N.C. 73, 83, 414 S.E.2d 22, 27 (1992). Humiliation and worry are not enough. Id. at 84, 414 S.E.2d at 27.

The Court finds that both of the arguments aimed at plaintiffs' emotional distress claim are correct. Plaintiffs say in conclusory fashion that defendant Green made several telephone calls to their place of business, some after being told not to call. Plaintiffs allege that Green used obscene language, belittled them, and was obnoxious. They do not describe any particulars in the complaint or its exhibit. Nor do they elaborate in their original response briefs. However, in their inappropriately refiled and expanded response to Academy and Green's motion, they do add that he allegedly told Robert Jolly that his employees could not read or write and were stupid because they could not take messages. They also claim that he told Crystal Jolly that she must not be able to read or write. (Resubmitted Resp. to Academy and Green's Mot. to Dis. p. 6)

Plaintiffs' allegations regarding Green's telephone calls do not remotely approach the level of injurious conduct necessary to

-27-

constitute extreme and outrageous conduct under North Carolina law. Boiled down to their essentials, they accuse him of nothing more than asking to speak to plaintiff Hollar about a debt that she did not owe and then cursing them and calling them stupid or illiterate when they did not take the messages he wished to leave. This or similar conduct was allegedly repeated on several occasions during a three month period. In the end, plaintiffs have alleged only that he spoke harshly to them several times and that they were offended. They were not physically threatened or intimidated in any way. Indeed, Green was not even present when the conversations occurred and plaintiffs were free to end the conversations at any time by simply hanging up the telephone.

As defendants point out, the North Carolina Court of Appeals has upheld the dismissal of an intentional infliction claim in circumstances far more egregious than alleged in this case. In the case of <u>Johnson v. Bollinger</u>, 86 N.C. App. 1, 356 S.E.2d 378 (1987), that court found dismissal appropriate where the defendant, while armed and wearing his animal control uniform, "'approached plaintiff . . . in an angry, hostile and threatening manner'" at the Cleveland County Law Enforcement Center, 'shook his hand in the plaintiff's face and said in a loud, rude and offensive manner . . ., "You are a stupid son-of-a-bitch," and "You are a liar," and stated further "I will get you."'" <u>Id</u>. at 3, 356 S.E.2d at 380. Despite the fact that the incident involved a uniformed officer, an in-person confrontation, the presence of a firearm, and close physical proximity in conjunction with cursing and angry threats,

the court concluded that it did not constitute extreme and outrageous conduct. Given this holding, there is no way that the allegations of the plaintiffs in this case, which consist of only cursing and angry insults, can survive a motion to dismiss. Even taking all of the facts listed in the complaint and elsewhere as true, plaintiffs allege nothing more than the "mere insults, indignities, and annoyances" that do not qualify as extreme and outrageous behavior under North Carolina law.

In addition to not alleging extreme and outrageous conduct by any of the defendants, plaintiffs have also failed to allege that they suffered severe emotional distress. Instead, the complaint states only in conclusory fashion that "plaintiffs has suffered and continues to suffer emotional distress and other diminishment of plaintiffs quality of life [sic]." (Complaint ¶ 52) The complaint does not describe any emotional distress suffered by plaintiffs to be severe, yet, as set out above, it is a requirement of North Carolina law that the stress be severe in order for plaintiffs to recover. This is also not a case of requiring "magic words" to be used. A complaint that alleged facts sufficient to qualify as severe emotional distress, but which did not use those exact words might well pass muster. However, plaintiffs' complaint not only fails to use the word "severe," but is also devoid of any allegations describing the distress suffered. The complaint fails to either state that severe emotional distress has been suffered or

allege facts that would allow this conclusion.  The claim should be dismissed for this additional reason.[9]

### 5. Negligent Infliction of Emotional Distress

The final claim in plaintiffs' complaint is for negligent infliction of emotional distress.  In order to establish such a claim, plaintiffs must show that defendants (1) negligently engaged in conduct, (2) which would reasonably and foreseeably cause plaintiffs severe emotional distress, and (3) which did, in fact, cause severe emotional stress.  Pardasani v. Rack Room Shoes, Inc., 912 F. Supp. 187, 192 (M.D.N.C. 1996).  Defendants believe that plaintiffs' complaint does not sufficiently allege either the second or third elements of this cause of action.

In support of their contention that plaintiffs have not alleged reasonable foreseeability, defendants point to the cases of

_____

[9]Plaintiffs' responses to the motions to dismiss suffer from the same problems that have caused their responses to other claims to falter.  They include conclusory statements, facts not contained in the complaint, and even inaccuracies.  For instance, in response to Citibank's motion, they claim that Citibank's continuing to list and try to collect a debt that it "defaulted on" is outrageous conduct and that "CITIBANK knowing plaintiff has lost her job is inflicting sever [sic] emotional distress causing severe depression on plaintiff." (Pl. Resp. to Citibank's Mot. p. 5)  In their response to Academy and Green's motion, they make two claims.  First, they assert that Green caused Hollar to lose her job and that "[a]nyone caused to lose their job and future cannot help but be in severe distress." (Pl. Resp. to Academy and Green's Mot. to Dis. p. 6)  Second, they claim that by falsely claiming that he was an attorney and making obscene comments, Green knew or should have known that "his actions would cause plaintiffs harm and in fact has caused plaintiffs sever emotional distress and loss of income, which is stated in exhibit 1 of the complaint [sic]." (Id.)  The first statement is a general conclusion and does not actually go as far as asserting that Hollar has actually suffered severe emotional distress.  The second statement misrepresents, and to some degree contradicts, the actual contents of Exhibit 1 to the complaint.  The letter does not claim that the content or nature of comments Green caused Hollar's firing, but instead attributes it to Mr. Jolly's reaction to the alleged disruption of his business caused by the calls.  It also makes no mention of any emotional distress, severe or otherwise, suffered by any plaintiffs.

-30-

<u>Gardner v. Gardner</u>, 334 N.C. 662, 435 S.E.2d 324 (1993), and <u>Fields v. Dery</u>, 131 N.C. App. 525, 509 S.E.2d 790 (1998), <u>rev</u>. <u>denied</u>, 350 N.C. 308, 534 S.E.2d 590 (1999). They state that these cases stand for the proposition that plaintiffs claiming negligent infliction in North Carolina must show that it was reasonably foreseeable to defendants that plaintiffs were "subject to an emotional or mental disorder or other severe and disabling emotional or mental condition as a result of [defendants'] negligence and its consequences." <u>Gardner</u> at 667, 435 S.E.2d at 328. They conclude that plaintiffs have not alleged this.

While defendants are correct in their citations to <u>Gardner</u> and <u>Fields</u>, it must be considered that those cases involve vastly different facts from the case at bar. In both of those cases, plaintiffs were suing defendants for emotional distress where the defendants had caused automobile accidents that killed the plaintiffs' children. The plaintiffs were not involved in the accidents themselves. Therefore, the language used by the courts in those cases appears to be an attempt to establish boundaries of foreseeability that would limit the recovery of persons who are third parties to a defendant's alleged negligent act. For example, as the court in <u>Gardner</u> noted, any parent who loses a child will likely suffer some amount of distress, but not necessarily of a level that would meet the legal definition of severe emotional distress. Therefore, North Carolina courts require third parties to an act of negligence to make a particular showing that they were within the group of people that a defendant could reasonably

-31-

foresee causing severe emotional distress to through his act of negligence. North Carolina has even developed special criteria for evaluating foreseeability in such instances. See <u>Fields</u> at 527, 509 S.E.2d at 591 (foreseeability for third-party recovery judged by "(1) the plaintiff's proximity to the negligent act, (2) the relationship between the plaintiff and the other person for whose welfare the plaintiff is concerned, and (3) whether the plaintiff personally observed the negligent act").

Because of the inapposite facts in <u>Gardner</u> and <u>Fields</u>, it is questionable whether much of their language regarding foreseeability would apply in this case. Plaintiffs allege that they (or at least some of them) were directly affected by the negligent acts, not that they were harmed by their concern for another's welfare. Put another way, if this case were judged by the three factors listed in <u>Fields</u>, plaintiffs' claim would stand because they were present for the alleged abusive telephone calls, they were the persons affected, and they did observe the alleged negligent acts. Not only this, but Green was aware of their presence when he spoke to them and that any acts he took would affect them. Therefore, it was entirely foreseeable that plaintiffs would be the persons injured by any negligent acts on his part.

The true nature of defendants' foreseeability argument does not appear to be that plaintiffs were not within the group of people that could be injured by any negligence on their part, but that severe emotional distress is not a foreseeable injury from the

types of negligence alleged. While this point can certainly be argued and may have a ring of correctness to it, as explained above, making such distinctions was not the aim of the cases they cite in support of the argument. Nor have they cited other cases supporting this idea or even showing that it is appropriate for the Court, as opposed to a jury, to make the decision as to what type of injury a direct victim of a particular type of negligence can foreseeably suffer.

Because the law cited by defendants does not support their argument regarding foreseeability, the Court will not grant their motions on this point. However, it can be granted based on their alternative argument that plaintiffs have failed to allege that they actually suffered severe emotional distress. This is explained in detail in the discussion related to plaintiffs' claim for intentional infliction of emotional distress and the negligent infliction claim should be dismissed for the reasons set out there.

## Conclusion

Academy and Green's motion to strike will be denied, and both of defendants' motions to dismiss should be granted. This will end Citibank's involvement as a defendant in the case and allow the case to go forward only as to the federal claims raised against Academy and Green.

Because the case will be continuing, it is necessary for the Court to address plaintiffs[10] concerning their future conduct in

---

[10]As it has throughout this Order and Recommendation, the Court uses the term "plaintiffs" to describe all of the plaintiffs. However, there are clear

(continued...)

this litigation. Throughout this litigation they have several times ignored this Court's rules regarding pleadings that can be filed and signatures which are required. For example, they filed what amounts to a surreply to Citibank's motion to dismiss (see docket no. 16) without asking or receiving permission to do so, filed responses to the motions to dismiss without including all plaintiffs' signatures, and significantly altered their refiled response to Academy and Green's motion to dismiss. While such mistakes are not uncommon from uninstructed pro se plaintiffs, the Court does expect its rules to be followed in the future and plaintiffs need to be more mindful of their actions the future or face sanctions.

Unfortunately, however, pleading problems are not the Court's most significant concern in this case. Far more troubling are the contents and tone of some of plaintiffs' pleadings. They often add, misconstrue, or even change facts as necessary to make a particular argument. Not only this, but their tone is sometimes snide, hyperbolic, and/or angry. They show few signs of civility or respect toward the opposing parties and have even crossed the line and become abusive on occasion.

Perhaps the most glaring example occurred when defendants correctly pointed out that plaintiffs violated the Court's rules by

---

[10](...continued)
indications in the record that Robert Jolly is the primary or sole author of many of the documents submitted by plaintiffs and that he is the driving force behind the litigation and plaintiffs' tactics in the litigation. Still, the other plaintiffs should be aware that are responsible for the contents of any documents that they sign.

submitting responses to the motions to dismiss which purported to speak for all of the plaintiffs, but were signed only by Robert Jolly. Rather than simply apologize for the mistake and refile the documents with all signatures, plaintiffs materially altered one of the documents before refiling and issued angry demands to Citibank in an improper surreply. They demanded to see Citibank's attorneys' law licenses, claimed erroneously that Citibank had demanded this of them[11], insisted that the licenses supplied include two intact state seals, and moved the Court to strike from the record "all motions by CITIBANKS [sic] alleged attorneys with a North Carolina license . . . and any future motions . . . except by defendant CITIBANK or attorneys with a North Carolina license." (Pl. Answer to Citibank's Reply In Support of the Mot. to Dis. p. 4) They added that, if the licenses were not produced as demanded, "plaintiffs say a fraud upon the court and plaintiffs has occurred. When someone demands something that doesn't exist from someone else that is **fraud**. Maybe the court can explain this to them." (Id.(emphasis in original)).

Plaintiffs' demands are frivolous and abusive, especially considering that, as explained in note 9, the alleged motive for the demands does not even exist. In the future, plaintiffs should

---

[11]What Citibank actually stated was that Mr. Jolly had signed three filings on behalf of all plaintiffs, but that "Mr. Jolly has represented to the Court that he is appearing pro se. There is no indication that Mr. Jolly is an attorney licensed to practice law in the state of North Carolina with the capacity or authority to represent the other Plaintiffs." (Citibank Reply in Support of its Mot. to Dis. p. 1-2) In no way, shape, or form did it demand to see Mr. Jolly or any other plaintiffs' law license. This is yet another example of plaintiffs twisting or inventing facts to suit their argument.

read defendants' statements closer and with greater accuracy. They should also refrain from responding with ridiculous and angry statements and demands. Plaintiffs can be sanctioned for litigating in an abusive manner, and the sanctions can include monetary fines and dismissal. The Court expects the remainder of this litigation to be conducted far differently than it has been up to this point.

Finally, each plaintiff must not only sign all pleadings which they wish to be attributed to them, but failure to oppose motions will lead to the motion being granted as to any non-opposing plaintiff. Each plaintiff must appear in person at all hearings or other Court scheduled events and should any plaintiff fail to appear, the action will be dismissed as to that plaintiff.

**IT IS THEREFORE ORDERED** that defendants Academy and Green's motion to strike or extend time to reply (docket no. 17) be, and the same hereby is, denied.

**IT IS RECOMMENDED** that defendants Academy and Green's partial motion to dismiss (docket no. 6) and defendant Citibank's motion to dismiss (docket no. 9) be granted.

Russell A. Eliason<br>
**United States Magistrate Judge**

September 12, 2005